Board of Tax and Land Appeals
No. 86-495

APPEAL OF LAKESHORE ESTATES

(New Hampshire Board of Tax and Land Appeals)

June 6, 1988

*Wescott, Millham & Dyer*, of Laconia (*Peter V. Millham* on the brief and orally), for the plaintiff, Lakeshore Estates.

*Decker, Fitzgerald & Sessler*, of Laconia (*James N. Sessler* on the brief and orally), for the defendant, the City of Laconia.

JOHNSON, J. The plaintiff, Lakeshore Estates (Lakeshore), appeals a decision of the State Board of Tax and Land Appeals (the board) that affirmed, on remand, an earlier board decision denying Lakeshore's request for an abatement of property taxes for the tax year commencing April 1, 1982. The board rendered the earlier decision on May 16, 1985, whereupon Lakeshore appealed to this court. We remanded the case to the board for specific findings of fact on seven questions that we posed for resolution. The board responded to those questions and affirmed its earlier decision denying Lakeshore an abatement. The board denied Lakeshore's subsequent request for a rehearing, and Lakeshore filed this appeal. We reverse and remand.

On February 17, 1982, the Westmount Realty Trust purchased Lakeshore Estates, a one-hundred-twenty unit apartment complex located on Blueberry Lane in Laconia, for $2,450,000. The sale agreement allocated $132,400 of the purchase price to personal property (stoves, refrigerators, air conditioners, etc.), leaving a balance of $2,317,600 for the real estate.

The City of Laconia (the city) assessed this property for the tax year beginning April 1, 1982, on the basis of a fair market value of $2,844,000 which, when adjusted for the 67% equalization rate employed by the city, resulted in an assessment of $1,900,000. Lakeshore requested an abatement, whereupon the city reduced the assessment to $1,800,000, based on a fair market value of $2,700,000. Lakeshore appealed the city's decision to the board, arguing that the city should have reduced the assessment to a figure that reflected the property's purchase price. Lakeshore maintained that the proper assessed value of the property, based on the purchase price of $2,450,000 and without an allowance for personal property, would be $1,641,500.

The board heard Lakeshore's appeal on June 14, 1984. The plaintiff has the burden of showing its assessment was disproportionately higher in relation to its true value than was the case as to other property in the city. *Duval v. Manchester*, 111 N.H. 375, 376, 286 A.2d 612, 613 (1971); *Ainsworth v. Claremont*, 106 N.H. 85, 87, 205 A.2d 356, 357 (1984). On May 16, 1985, the board rendered a decision that denied Lakeshore's request for an abatement on the ground that Lakeshore had failed to prove that the revised assessment of $1,800,000 was excessive, entitling it to an abatement. Although the board acknowledged that the selling price was "cogent evidence" of the property's fair market value, it rejected the $132,400 personal property allowance stipulated by the parties to the sale because they had not assigned dollar values to

individual items of personalty, or even to categories of personalty. Moreover, the board concluded that the favorable interest rates that Lakeshore enjoyed under the sale agreement rendered the purchase price unreliable as evidence of the fair market value of the property.

After Lakeshore appealed to this court, we remanded to the board for findings on the following seven questions:

1. Was the sale of this property an arm's-length transaction?

2. On what grounds did the board reject the $132,400 value that the parties assigned to the personalty that was sold along with the real estate?

3. What was the fair market value of the personalty?

4. Did the board believe that the sale price of the real estate accurately reflected its fair market value?

5. What did the board think that the fair market value of the property was?

6. Did the Board adopt the "gross rent multiplier" valuation procedure employed by the city's assessor?

7. Did the board believe that the city's assessor correctly used the "gross rent multiplier" procedure in determining the value of this property?

The board answered the above questions as follows:

1. No, the sale was not an arm's-length transaction.

2. The $132,400 personal property valuation was rejected because Lakeshore failed to assign specific values to each item of personalty.

3. The fair market value of the personalty was indeterminable.

4. The board was unable to determine the actual sale price of the Blueberry Lane property and the indicated sale price is an indication of, but is not conclusive evidence of, its fair market value.

5. The board was unable to determine the fair market value of the property on the basis of the evidence presented.

6. No, the board did not adopt the gross rent multiplier valuation procedure used by the city.

7. No, the board believed that the city erred in its use of the gross rent multiplier procedure in determining the value of the Blueberry Lane property.

Upon receipt of the board's responses to the above questions, and its ruling affirming the earlier decision and denying Lakeshore an abatement, Lakeshore requested a rehearing, which the board denied. Lakeshore contended that the board's decision on remand derived from a conclusion that the sale of this property had not been an arm's-length transaction, but rather, an unusually favorable transaction for a buyer who had enjoyed a pre-existing relationship with the seller between November 9, 1981, when the sale agreement was signed, and February 17, 1982, when the closing occurred.

The board's apparent reservations about the independence of the sale resulted from the fact that on December 7, 1981, approximately one month *after* the November 9 signing of the sale agreement for the Blueberry Lane property, the seller received a $425,000 loan, secured by a mortgage on that property, from Admiral Shoe Corporation, whose president was also a general partner in Lakeshore Estates. Since the city had not raised the mortgage issue during the June 14, 1984 hearing before the board, and since the board had raised the issue for the first time in its decision on remand, Lakeshore requested a rehearing on the mortgage issue alone. Lakeshore sought to present evidence concerning the execution of the mortgage so that the board could assess the mortgage's impact, if any, upon the purchase price of the Blueberry Lane property. When the board denied its rehearing request, Lakeshore appealed to this court.

■■ The scope of review in cases appealed under the provisions of RSA 76:16-a, *Appeal of Clark Hill Forest Products, Inc.*, 128 N.H. 352, 353, 513 A.2d 356, 356 (1986), is limited to questions of law. *Appeal of Harvey Road Assoc's*, 122 N.H. 24, 26, 440 A.2d 11, 12 (1982). The findings of fact by the board are final. However, this court has remanded for further proceedings and/or findings when "[i]t is impossible for us to tell what facts as found by the board support its finding that the assessment was proper and that no abatement was warranted . . . ." *Appeal of Harvey Road Assoc's supra* (quoting *Vickerry Realty Co. Trust v. City of Nashua*, 116 N.H. 536, 538–39, 364 A.2d 626, 629 (1976)). In this case, it is impossible for us to determine what facts the board found to ascertain the propriety of the assessment against Lakeshore and the inappropriateness of the abatement that Lakeshore sought. It is also impossible for us to determine what facts the board used in concluding on remand that the December 7, 1981 mortgage agreement between the seller and Admiral Shoe Corporation tainted the sale of the Blueberry Lane property, because the board

denied Lakeshore an opportunity, through a rehearing, to present evidence concerning the execution of the mortgage.

▌▌ Lakeshore presented sufficient evidence to support a finding by the board that the assessment was excessive and that an abatement was indeed warranted. Lakeshore contends that the rule in New Hampshire in cases of this type is that the sale price of a piece of property indicates its fair market value, and that the customary rule should prevail in this case. This court has indeed stated that "[t]he sale price of a piece of property is evidence of its value unless the court finds on evidence that there was not a fair market." *Berthiaume v. City of Nashua*, 118 N.H. 646, 648, 392 A.2d 143, 144–45 (1978). We have also stated that "[t]he price paid by the owner is one of the best indicators of that property's value." *Poorvu v. City of Nashua*, 118 N.H. 632, 633, 392 A.2d 138, 139 (1978) (citing P. NICHOLS, THE LAW OF EMINENT DOMAIN § 12.311(1) and § 21.2 (rev. 3d ed. 1977)). The city, on the other hand, introduced no evidence that clearly indicated that the sale of the Blueberry Lane property was not consummated in a fair market.

▌ Lakeshore also contends that the sale of this property represented an arm's-length transaction, and that it introduced evidence sufficient to convince a reasonable fact-finder of same. An arm's-length transaction is "[a] transaction freely arrived at in the open market, unaffected by abnormal pressure or by the absence of normal competitive negotiation as might be true in the case of a transaction between related parties." B. BOYCE, REAL ESTATE APPRAISAL TERMINOLOGY 18 (rev. ed. 1984). The record suggests that this sale was consummated by a buyer and a seller who were experienced in the purchase and sale of real estate and who were represented by counsel in the preparation and execution of the sale agreement, as well as at the closing.

The record also suggests that this sale would not have been consummated absent the efforts of a real estate broker, who brought the parties together to transact business. The fact that the broker was paid a commission of $50,000 for such efforts appears to indicate that buyer and seller were zealously protecting their respective competitive interests in arm's-length negotiations, rather than seeking to effectuate a mutually advantageous arrangement.

The record further reveals that Mr. Russell Thibeault, a real estate appraiser who had appraised the Blueberry Lane property at Lakeshore's request, testified at the 1984 hearing before the board that buyer and seller were typically motivated and that both were well-informed real estate professionals. He also testified that

the subject property was advertised for a reasonable time in the Wall Street Journal and the Boston Globe. Mr. Thibeault concluded that this sale was an arm's-length transaction between an informed buyer and an informed seller, and that it reflected fair market conditions.

Lakeshore also introduced sufficient evidence to prove the appropriateness of the $132,400 allocation to personal property. Although buyer and seller did not assign a dollar value to each item of personal property, or even to each category of personal property, they did assign a reasonable value to the total inventory of such property. Mr. Thibeault testified that when he appraised the Blueberry Lane property, he valued the personal property associated with it at slightly more than $1,000 per apartment, which would result, for the 120-unit complex, in a personal valuation that would approximate the $132,400 figure agreed to by buyer and seller. The board, armed with this evidence, would have been justified in concluding that the $132,400 figure was a reasonable estimate of the fair market value of the personalty associated with the Blueberry Lane property.

Finally, Lakeshore introduced adequate evidence to prove that the mortgage loan agreement executed on December 7, 1981, between the seller and Admiral Shoe Corporation did not diminish the reliability of the sale price as evidence of the fair market value of the Blueberry Lane property. The purchase and sale agreement was dated November 9, 1981, and the parties to it were Marina Development, Inc., as seller, and Westmount Realty Trust, as buyer. The mortgage loan agreement, wherein Arthur Steckler, the owner of Marina Development, Inc., borrowed $425,000, did not involve the Westmount Realty Trust, but rather, Admiral Shoe Corporation, a wholly different entity.

Moreover, the loan that Steckler received, which was secured by the mortgage he held on the Blueberry Lane property, was not arranged until a month *after* the sale price of the property had been established; hence, the evidence suggests that the loan did not influence the price of the property. There is no evidence indicating that "the motivating circumstances influencing the parties [to the purchase and sale agreement] were such as probably to materially affect the price paid, and therefore to destroy its usefulness as a standard of value." *Eames v. Corporation*, 85 N.H. 379, 383, 159 A. 128, 130 (1932).

> "Without ruling upon the merits of the taxpayer's request, we hold that the findings of fact as contained in the board's decision are insufficient to support its decision. Although

it appears that the board had before it evidence of sales prices of other comparable property, the sale price of the property in question, and several appraisals of the property in question, we are unable to tell how the board evaluated this evidence. When there appears to be some credible evidence before the board, a decision that amounts to a bald conclusion that the taxpayer has failed to satisfy his burden of proof cannot, without more, be sufficient to support the board's decision."

*Appeal of Harvey Road Assoc's*, 122 N.H. at 26, 440 A.2d at 13.

We therefore reverse the decision of the board of tax and land appeals and remand to the board for entry of an order granting the requested abatement.

*Reversed and remanded.*

All concurred.